Musa v. Lynch. Mr. Kante. May it please the court, my name is Soare Kante. I represent Ms. Batusi Musa. This is an asylum case. There are two issues before the court. Number one, whether or not the application for asylum was timely in view of the exceptions to the one-year rule. I'm going to skip that and concentrate on whether or not there was sufficient evidence, corroborative evidence, to support Ms. Musa's case for asylum. Now since the Real ID Act was passed in 2005, this court has had occasion to review the issue of the availability of documentation. Indeed, the Real ID Act requires corroboration even if the applicant was credible on his own, but supporting documentation must be provided only if it is the type that would normally be created and or available and is accessible to the applicant. The court has spoken on the issue on several occasions consistent with the language in the Real ID Act that no court shall reverse a determination made by a trial fact with respect to the availability of corroborating evidence unless the court finds that a reasonable trial fact is compared to conclude that such corroborating evidence is unavailable. Now, the government just submitted to the court the case, and I'm going to mispronounce the name here, Darin Chuluf versus Lynch, I believe for the proposition that Ms. Musa did not provide sufficient corroborating evidence in this case. We submit to the court that she did. The Darin Chuluf case is very distinguishable from this case. In that case, in this case, Musa provided refuted, credible, and direct testimony. She indicated that she was a member of the Kalanga ethnic group from circumcision, otherwise known as FGM. As a minor, there were two failed attempts to subject her to circumcision. On both occasions, she was able to elude her attackers. It is also true that her parents have contracted her on numerous occasions to persuade her to marry a 75-year-old man. However, her primary motivation for seeking asylum is to avoid female circumcision. Mr. Kante, should we be worried more about the motivations of Ms. Musa, or more about the motivations of the potential persecutors? We have to worry about the motivation of the potential persecutors. That's what I thought as well. Yes. So, well, and the importance of that question is that Ms. Musa's father, because of economic circumstances, contracted with this older man to bring her for marriage. But, as part of that, she had to be circumcised. And, in fact, that is one reason that Musa came before this government to seek protection. That's the reason I ask, is because, frankly, I didn't quite understand the immigration judge's reasoning as to whether she's more reluctant to marry this fellow in to undergo this rather brutal procedure. And, I'm not sure that it really matters. Well, we don't believe it matters, Your Honor. And, in fact, we don't know what evidence, what else, that the Immigration Court and the Board of Immigration Appeals were looking for. In this case, the board and the immigration judge both agreed that she was very credible, a credible witness. And, she also brought someone who is also from Botswana, a female, six years older than Ms. Musa, who testified about the existence of the practice in Botswana. I think the main claim by the board is that this is not a practice that is well-documented in Botswana. And that, to that, Ms. Musa conceded, even though it's not well-documented, but it is, in fact, practiced by her family. The State Department, which has a list of all the countries, and whether they, and whether, you know, this female genital mutilation is found in those countries, lists Botswana as one of the countries that doesn't have it. Well, the only document they have on the record, Your Honor, is a 2011 report. And, what that report says, what female genital mutilation. And, I think this court has indicated, instructed, there is also testimony, there's also indication, the immigration judge did provide an article from UNICEF, which he relied upon, and suggested that there was five percent possibility of the practice of female genital mutilation in Botswana. So, we suggested that that five percent, it does not, it's not exclusive. Just because five percent doesn't mean Ms. Musa could not be subject to female genital mutilation. And, I harken back to the case that was there, that was previously argued before this court a few minutes ago, it is not the quantity, Your Honor, if it's the possibility. And, this is the often-cited. No, I agree that five percent would be significant, but how solid is the evidence that there is that much of this practice? Well, and frankly, Your Honor, it is not a well-publicized practice in Botswana. But, based on the testimony of these two individuals who actually grew up in Botswana, and know the customs and tradition, did testify, and for that matter, credibly, that this is a practice that occurs among the Kalanga ethnic group from the Tshiba village where Ms. Musa comes from. So, would she have to go back to that village? Well, and that's one of the indications, that's one of the arguments that was made by the government. The problem, Your Honor, is that the Kalanga ethnic group is spread all over Botswana. They are not restricted to one area. So, she may move to some other town in Botswana, but that does not obviate the fact that there's a possibility, very strong possibility, that she may be subjected to circumcision. Sorry, just so that I understand that answer, Mr. Kante, she could not get away from that other members of that ethnic group who would be in touch with her home village and parents? Is that the idea? Yes, she's not going to be able to do that. She can't stay anonymously in some other part of the country? Absolutely not, Your Honor, because, in fact, when she left Botswana, she was a very relatively young woman. She does not have too many ties, anyway, in Botswana other than her own relatives. So, I don't know how she's going to be able to stay anonymous from her relatives in Botswana. I mean, I realized that was an issue that seemed to have been raised for the first time by the board itself without any findings by the immigration judge, but if this were to go back, that question would seem to require a lot of additional exploration. That is correct, Your Honor, we agree with that. Does she have an education or profession? She did attend a university, a high school in Zimbabwe, and then came back to Botswana after she completed that education, but here she has not been able to attend school here yet, and mainly because of this myriad immigration problems that she has encountered since she came into the country. Upon coming here, she got romantically involved with a gentleman whom she ended up marrying, and then this gentleman, unfortunately, was not divorced from his previous wife in Tennessee. It was during the interview. That is a problem. Right, so when we went for the immigration interview, it was the application was denied, and then the marriage went, exploded. When she went back to Botswana, did she have a job there? Did she work there? Well, right now she's in Botswana, Your Honor. Did you say she has a job right now? Well, in either place. She has a job here right now. She lives in Chicago right now and works for, as a human resource director for a company down here in I'm not going to go too much into the issue of whether or not this court has jurisdiction to discuss the timeliness of her application, but from the brief, we showed that the judge's decision was very confusing in terms of whether or not she met the exceptional circumstances provision of the statute. I think when the court reads that, they will see that this case needs to be reminded so the immigration judge can flesh out the problems with the decision. Do you want to save the rest of your time for rebuttal? Yes, Your Honor. Thank you, Mr. Conte. So, Mr. Byland? May it please the court, Jeremy Byland on behalf of the respondent. We believe this is an evidentiary issue and the substantial evidence supports the board's determination that Moosa failed to carry her burden of proof in establishing her eligibility for withholding and for protection under the Convention Against Torture. If you look at the evidence that was provided, in the record we have a 2011 U.S. State Department report and it states... We have the general country reports, but we also have the petitioner's testimony, which was credited by the immigration judge. So what more is needed? Well, we also credit her testimony, the fact that she lived with her family for many years after the incidents. So the two incidents were in the course of August 2003 incident. And then she continued to live with her family in 2003 and 2004 and 2005 without incident. She testified... And then got away. Excuse me, sir? And then got away, right? Yes, Your Honor. Do we know where she went? She went to a city called Orpha and she testified that that... At page 153 of the record, she testified that that city was actually very close to her home village. And so she resided in that city from 2005 until 2008, so she came to the United States on April 23rd, 2008. So we do credit her testimony, but we credit her entire testimony, the fact that she lived with her parents for a substantial amount of time after those incidents. What about Mr. Conte's contention that this Kalanga tribe that she belongs to, that they practice female genital mutilation, even though the other people in Botswana don't, apparently? Yes, Your Honor. I think if you look at her testimony, what she says is that her family does. The evidence in the record does not support the fact that the Kalanga tribe does. We know it's very large. It's all over the country. And if it were the case that it was pervasive in the Kalanga tribe, then we would expect to see that come up in the UK Border Agency report, the US State Department report. The other thing I'll say about the UNICEF graphic, petitioner claimed that it's set up to a 5% chance, but I think if you look at the graphic, it's less than 1%. And it's not saying affirmatively that it does exist there, but if it is, it would be less than 1%. So I would challenge that 5% claim. And then if you look at page 22 of our case, or this case to the Agbor case, in Agbor, the petitioner provided background evidence that said that FGM was practiced in her specific county where she was from. She also provided affidavits, or excuse me, letters from family, and also testimony from a social worker who confirmed that it existed. When you compare that to the evidence here, you can see that we have an evidentiary problem here. The evidence that petitioner provided was an article about initiation rights in Botswana, a letter from her mother, her witness's testimony, and then her own testimony. An immigration judge was justified in giving liberal probative weight to three of those sources of evidence. Specifically, the article does not reference the Kalinga ethnic group at all, references a different group, and doesn't talk about female circumcision. The letter from the mother also doesn't reference circumcision. Of course not. But given that the immigration judge believed her, believed the family had tried this twice before, and was trying to get her to come back under circumstances in which it seems reasonably likely she would be required to undergo this mutilation, I don't understand why more evidence would be needed. She only promised her that they wouldn't try again. That's in the record, and they didn't try. She lived with them for many years after the attempts. But now, there's an answer for that, right? With respect to her father's change in position and this marriage. I think if you look at that, that change happened before. Okay. But it's just that there's just the lack of evidence, and that's the government's position. You have her presentable testimony that cut against the objective case in proving that it's more likely or not that she would be subjected to it if she returned. So the immigration judge's decision seemed internally inconsistent to me. At page 6, he says, I consider petitioner's testimony to have been credible as to these experiences. I have no reason to disbelieve them. Her testimony was largely consistent on this particular issue, etc. I don't agree that these incidents constitute past persecution. At least one of them seemed to count as kidnapping and a gang assault, I would think. Wouldn't you? The 2003 incident where the men grabbed her and tried to subject her to mutilation. I wouldn't agree that that established past persecution. You look at the harm she actually suffered, and she didn't suffer harm. Because she got away? Well, the fact is they didn't try very hard. I mean, if you look at the two instances, eight months apart, she was able to hide in the village. I mean, it's just that they didn't try very hard to do it. So it's not persecution? Well, the IJ and the board both concluded there was no past. But the IJ believes her, and then in the next page says there's no credible evidence to show that female genital mutilation is practiced in the respondent's ethnic group. I think what he's saying is that the Kalingas, as a general matter, do not practice FGM, but the family... He's not disputing the fact that the family does, but as I said to Judge Posner, if the Kalinga group actually practiced FGM at a large, or at a high rate, then that would show up in these reports that are very detailed. And I think the board, the way the board read what the immigration judge was saying is that though we credit her testimony, there's this lack of evidence in the record that it's actually practiced by her ethnic group. Not that it's not practiced by her family, but by her ethnic group. Doesn't that seem a heck of a lot more relevant to this woman? It does, Your Honor. But again, she lived with them for many years afterwards without incident, and her credible testimony is that there was no incident, and that they promised they wouldn't try it again. Is that it? Yes, thank you, Your Honor. Okay, thank you very much, Mr. Bynum. So, Mr. Conte? Yes, Your Honor. How much time does... Okay, we have a minute. We'll give you a minute. Oh, I'm sorry. No, no, no. Go ahead. Judge, recently, I argued a case before this court, and that is Sibanda v. Holder. It was a February 2015 case. It also deals with the issue of corroboration, and this court remanded the case back to the immigration court. And this is mainly because when you're dealing with distinct traditional practices, it's often difficult to obtain physical documentation to support a case like that. But if the witness or the applicant is credible, and they provide detailed and specific testimony, I think that must be accorded significant weight. And that's the same thing in this case, Your Honor. We ask that this court remand the case back to the... What was the name of that case again, please? Sibanda v. Holder. Sibanda? Sibanda. S-I-B-A-N-D-A. Unfortunately, I didn't put the citation in. Close enough. Okay, thank you.  Thank you. Okay, well thank you very much to both counsel, and the court will be in recess.